## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| MARVIN TROLLINGER, | ) | CASE NO. 1:17CV01358 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Marvin Trollinger, ("Plaintiff" or "Trollinger"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act, 42 U.S.C. §§ 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42

U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to

an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the

reasons set forth below, the Magistrate Judge recommends that the Commissioner's final

decision be VACATED and the case REMANDED for further proceedings consistent with this

decision.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.    PROCEDURAL HISTORY

In December 2014, Trollinger filed an application for SSI, alleging a disability onset date of May 1, 2010 and claiming he was disabled due to knee and back conditions.  (Transcript ("Tr.") 192, 223.)  The applications were denied initially and upon reconsideration, and Trollinger requested a hearing before an administrative law judge ("ALJ").  (Tr. 142, 150, 155.)

On December 2, 2016, an ALJ held a hearing, during which Trollinger, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 48-102.)  On March 23, 2017, the ALJ issued a written decision finding Trollinger was not disabled.  (Tr. 20.)  The ALJ's decision became final on June 8, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On June 27, 2017, Trollinger filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11 & 12.) Trollinger  asserts the following assignments of error:

(1) Whether the ALJ's determination that Mr. Trollinger's use of a cane was not prescribed and did not impose a work-related restriction is supported by substantial evidence.

(2) Whether the ALJ utilized appropriate standards in the assignment of little weight to the opinions of Social Security's consulting physician and to Plaintiff's treating physician's assistant.

(3) Whether material new evidence warrants remand.

(Doc. No. 11.)

# II.    EVIDENCE

## A.    Personal and Vocational Evidence

Trollinger was born in May 1964 and was 52 years-old at the time of his administrative

2

hearing, making him a "person closely approaching advanced age" under social security regulations.  (Tr. 40.)  *See* 20 C.F.R. § 416.963(d).  He has a high school education and is able to communicate in English.  (*Id.*)  He has past relevant work as a coin collector and moving van driver helper.  (*Id.*)

**B.    Medical Evidence**

As Trollinger's grounds for relief solely relate to his physical impairments, the Court's recitation of the medical evidence will be limited to those impairments.[2]

On December 2, 2014, Trollinger visited physicians' assistant Christina Stehouwer, PA, reporting progressive left knee pain.  (Tr. 337.)  He indicated his left knee had been buckling while walking and he was ambulating with a crutch.  (*Id.*)  On examination, Trollinger's right knee had a long scar from a remote gunshot wound.  (*Id.*)  His left knee had a mild to moderate joint effusion, tenderness along the medial joint line, and pain with extreme flexion.  (*Id.*)  Ms. Stehouwer ordered an x-ray and prescribed physical therapy.  (*Id.*)  Bilateral knee x-rays revealed a remote gunshot wound with mild degenerative changes in the right knee and moderately severe degenerative joint disease in the left knee.  (Tr. 339.)

Trollinger underwent a physical therapy evaluation with physical therapist Kristen Bacik, PT, on December 10, 2014.  (Tr. 372.)  He reported using a standard cane for the past 1.5 years due to his left knee pain.  (*Id.*)  On examination, Trollinger had tenderness and a decreased range of motion in both knees.  (Tr. 373.)  He had decreased strength in his legs and hips.  (*Id.*)  He was able to move from sitting to standing independently, but had to use his arms and extend his left

---

[2]    The Court further notes that its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

knee.  (Tr. 374.)  Ms. Bacik observed Trollinger was using a standard cane to ambulate.  (*Id.*)

Trollinger proceeded to attend aquatic therapy in December 2014 and January 2015.  (Tr. 378, 381, 384, 390, 393.)  On December 12, 2014, he was ambulating with a straight cane and had significant edema in his left knee.  (Tr. 378.)  He was able to tolerate the physical therapy exercises, but had increased swelling in his left knee following his therapy session.  (Tr. 379.)  Trollinger continued to use a cane to ambulate on December 18 and 23, 2014.  (Tr. 381, 384.)  He indicated slightly decreased pain levels after his December 18, 2014 physical therapy session.  (Tr. 382.)

On January 2, 2015, Trollinger exhibited increased edema during his aquatic therapy session.  (Tr. 391.)  He also reported back pain and was ambulating with a cane.  (Tr. 390.)  His physical therapist determined the back pain was likely due to his poor gait and recommended Trollinger see an orthopedist.  (Tr. 391.)  Trollinger was again ambulating with a cane on January 6, 2015.  (Tr. 393.)

During his January 8, 2015 aquatic therapy session, Trollinger reported worsening pain in his back, hips, and knees.  (Tr. 396.)  He was ambulating with a cane and had bilateral knee tenderness.  (Tr. 396, 397.)  Trollinger's knee range of motion had improved, but he had made minimal gains in lower extremity strength.  (Tr. 398.)  His therapist noted Trollinger did not meet most of his therapy goals and recommended he visit an orthopedist.  (*Id.*)

Trollinger consulted with orthopedist Carlos A. Higuera Rueda, M.D., on January 15, 2015.  (Tr. 403.)  Trollinger reported he had undergone two right knee surgeries for a bullet wound in the 1980s and a left knee arthroscopy.  (Tr. 404.)  On examination, he had a normal gait and did not have difficulty getting off the examination table.  (Tr. 405.)  He had tenderness

4

to palpation and a decreased range of motion in his left knee, but normal sensation and no crepitus.  (*Id.*)  Bilateral knee x-rays revealed severe medial compartment joint space narrowing with a small suprapatellar joint effusion in the left knee and mild degenerative changes and a remote gunshot wound on the right.  (Tr. 447.)  Dr. Higuera Rueda recommended Trollinger continue physical therapy and anti-inflammatory medications.  (Tr. 403.)

Trollinger returned to physical therapy on January 15, 2015.  (Tr. 412.)  He was wearing a left knee brace and ambulating with a cane.  (*Id.*)  On January 20, 2015, Trollinger reported he had been icing and performing exercises at home, which he found helpful.  (Tr. 416.)  He continued to use a cane for ambulation.  (*Id.*)  His physical therapist noted an increased exercise tolerance.  (Tr. 417.)

On January 22, 2015, Trollinger visited Ms. Stehouwer for follow up.  (Tr. 351.)  He indicated he discontinued using his knee brace because it was too tight.  (*Id*.)  He also reported feelings of depression in connection his transition back into society after 27 years of incarceration.  (*Id*.)  Ms. Stehouwer prescribed Naproxen and Zoloft.  (*Id*.)

Trollinger attended physical therapy on January 26, 2015, reporting he was performing his home exercises daily and his pain had decreased.  (Tr. 419, 420.)  He was ambulating with a standard cane on his right side.  (Tr. 419.)

Trollinger returned to physical therapy on February 24, 2015, indicating he had not attended therapy recently due to sickness.  (Tr. 424.)  He admitted he was not performing his exercises due to being "lazy."  (*Id*.)  He was ambulating with a standard cane on his right and had a significant decline in lower extremity strength on examination.  (Tr. 425, 426.)

On March 9, 2015, Trollinger returned to Ms. Stehouwer, reporting his knee pain was a

"major issue." (Tr. 486.) Ms. Stehouwer prescribed Naproxen. (*Id.*) The next day, Trollinger visited the emergency room for left knee and foot swelling. (Tr. 453.) On examination, he had left lower extremity edema and a slight loss of range of motion in his left ankle. (*Id.*) The emergency room physicians diagnosed plantar fasciitis of the left foot and provided ibuprofen and a referral to a podiatrist. (Tr. 455.)

Trollinger followed up with Dr. Higuera Rueda on March 19, 2015, reporting no significant improvement in his left knee symptoms. (Tr. 428.) Dr. Higuera Rueda advised against surgery due to his age and administered a steroid injection into Trollinger's left knee. (*Id.*)

On March 14, 2015, Trollinger visited the emergency room for shortness of breath, chest pain, and left arm numbness. (Tr. 440, 464.) He was admitted for a cardiac evaluation. (Tr. 464.) He had an abnormal EKG, but a negative stress test. (Tr. 440.) Trollinger subsequently visited cardiologist John Stephens, M.D., on May 21, 2015. (*Id.*) Dr. Stephens ordered a left heart catheterization and labwork. (Tr. 442.)

Trollinger underwent a left heart catheterization on June 15, 2015. (Tr. 533.) The procedure revealed non-obstructive coronary artery disease. (Tr. 554.) On June 18, 2015, Trollinger saw cardiologist Khaldoun Tarakji, M.D., for evaluation. (*Id.*) Dr. Tarakji reviewed the catheterization results and diagnosed premature ventricular contractions ("PVCs"). (*Id.*) Dr. Tarakji recommended an ablation procedure to correct his PVCs. (Tr. 556.) Trollinger eventually underwent ablation on February 18, 2016, but it was not successful. (Tr. 616.)

On June 30, 2015, Ms. Stehouwer noted Trollinger was ambulating with a cane. (Tr. 481.) She renewed his Naproxen prescription. (*Id.*) Trollinger then began to report neck pain.

A July 7, 2015 cervical spine x-ray revealed spondylotic changes, mostly involving the disc spaces of the middle to lower cervical spine.  (Tr. 558, 570.)

On August 4, 2015, Trollinger visited Ms. Bacik for physical therapy for neck pain radiating into his arms.  (Tr. 570.)  He also indicated a desire to improve his walking ability.  (*Id*.)  On examination, Trollinger had an independent gait with a cane, slightly decreased strength in his shoulders and biceps, normal sensation, and normal reflexes.  (Tr. 571, 572.)

Trollinger then missed two physical therapy appointments.  (Tr. 577, 579.)  On August 24, 2015, he returned to therapy with decreased neck pain, indicating his home exercises were helpful.  (Tr. 580, 581.)  Trollinger cancelled his August 31, 2015 physical therapy appointment.  (Tr. 583.)  He returned on September 2, 2015, again reporting improvement in his neck pain.  (Tr. 586.)  His cervical range of motion was normal, but he continued to ambulate with a cane.  (Tr. 586, 587.)  As Trollinger had met or partially met all his physical therapy goals, he was discharged from therapy.  (Tr. 588.)

On October 20, 2015, Trollinger visited Dr. Higuera Rueda, reporting no improvement in his left knee pain.  (Tr. 590, 591.)  On examination, he was ambulating with a cane, he had a limited range of motion in his knee, but no crepitus.  (*Id*.)  Bilateral knee x-rays revealed severe osteoarthritis in his left knee and minimal degenerative changes on the right.  (Tr. 605.)  Dr. Higuera Rueda referred Trollinger for an ultrasound-guided trigger point injection.  (Tr. 590.)  On November 6, 2015, Trollinger underwent an ultrasound-guided trigger point injection on his left knee with orthopedist Michael Shaefer, M.D.  (Tr. 601.)

On January 26, 2016, Trollinger visited spinal specialist Anantha Reddy, M.D., for left leg and back pain.  (Tr. 638.)  On examination, he had an antalgic gait with a cane and was

unable to heel or toe walk.  (Tr. 640.)  He had a limited lumbar range of motion, but normal

sensation, no atrophy, and normal reflexes.  (*Id*.)  Dr. Reddy referred Trollinger for physical

therapy and prescribed steroids and Neurontin.  (Tr. 641.)

On February 16, 2016, Trollinger visited pain management physician Bruce Vrooman,

M.D., for lower back pain.  (Tr. 649.)  An x-ray of the lumbar spine revealed multilevel

degenerative disc disease, worse at the L2-L3 level.  (Tr. 650.)  On examination, he had an

antalgic gait with a cane and swelling in his left knee.  (Tr. 653.)  His straight leg raise was

negative and his upper and lower extremity strength was normal and symmetric.  (*Id*.)  Dr.

Vrooman scheduled Trollinger for a lumbar epidural steroid injection.  (*Id*.)  His health insurance

denied approval for this injection, as Trollinger was required to attend physical therapy first.  (Tr.

616.)

Trollinger underwent a physical therapy evaluation with physical therapist James

Edwards, PT, on February 22, 2016.  (Tr. 657.)  He reported back pain radiating down his right

leg.  (Tr. 657, 658.)  On examination, he was ambulating with a cane and had decreased range of

motion in his lumbar spine.  (Tr. 658.)  Trollinger then began to attend aquatic therapy for his

lower back pain.  (Tr. 665.)  On February 25, 2016, he was exhibiting pain behaviors throughout

his therapy session.  (*Id*.)  On March 3, 2016, Trollinger reported he "felt good" after his last

session.  (Tr. 669.)  He continued to ambulate with a cane.  (*Id*.)  Trollinger proceeded to miss

several scheduled physical therapy appointments.  (Tr. 673, 675, 677.)  He was eventually

discharged from physical therapy on March 21, 2016.  (Tr. 679.)

On March 9, 2016, Trollinger visited Ms. Stehouwer for chest pain.  (Tr. 617.)  Ms.

Stehouwer reviewed Trollinger's previous cardiac workup and concluded this pain was likely

non-cardiac in origin.  (*Id*.)  She diagnosed GERD and prescribed medications.  (*Id*.)

Trollinger returned to Dr. Reddy on March 22, 2016.  (Tr. 681.)  On examination, he had an antalgic gait and was ambulating with a cane and left knee brace.  (Tr. 682.)  He was unable to heel or toe walk and his lumbar range of motion was limited in all directions.  (*Id*.)  Dr. Reddy recommended Trollinger continue physical therapy.  (Tr. 683.)

On March 24, 2016, Trollinger attended physical therapy and reported back and left leg pain.  (Tr. 692.)  He was using a cane for ambulation and his gait had a shortened stride with an antalgic appearance.  (Tr. 693.)  His trunk range of motion was decreased but his sensation was intact.  (*Id.*)

On March 31, 2016, Trollinger visited several different medical providers for treatment. He saw Ms. Stehouwer and requested referral for Hepatitis C treatment.  (Tr. 614.)  At that time, he indicated his pain was tolerable on his current medication regimen.  (*Id*.)  Trollinger also saw nurse practitioner Polina Engelhardt, NP, at his cardiologist's office.  (Tr. 701.)  He denied any chest pain, shortness of breath, or palpitations.  (Tr. 702.)  He reported occasional "skipped beats," so Ms. Engelhardt ordered a Holter monitor.  (Tr. 702, 703.)  The Holter monitor revealed sinus tachycardia.  (Tr. 709.)

Trollinger also saw Dr. Higuera Rueda on March 31, 2016.  (Tr. 712.)  He reported good results initially following his knee injection, but indicated his knee symptoms had since returned. (*Id*.)  Dr. Higuera Rueda recommended a repeat injection and noted Trollinger's gait was normal. (Tr. 712, 713.)  A physical therapy progress note from that same day indicated Trollinger was still using a cane to ambulate and had a shortened stride with an antalgic appearance.  (Tr. 697.)

An April 4, 2016 lumbar CT scan revealed mild and shallow disc bulges within the

lumbar spine, but no spinal cord stenosis.  (Tr. 621.)

During an April 7, 2016 physical therapy appointment, Trollinger was ambulating with a cane and had a shortened stride and antalgic gait.  (Tr. 719.)  On April 14, 2016, Trollinger reported decreased pain after his last therapy session.  (Tr. 722.)  However, he ambulated in a forward bent position, his transitional motions were antalgic, and he decreased trunk range of motion.  (*Id.*)

On April 26, 2016, Trollinger visited Dr. Reddy, reporting his back pain was improving and the physical therapy was helpful.  (Tr. 725.)  He continued to have an antalgic gait with a cane, mild tenderness in his paraspinal muscles, and a limited lumbar range of motion.  (Tr. 726.)  His neck range of motion was normal.  (*Id.*)  Dr. Redddy increased Trollinger's Neurontin dosage and concluded spinal surgery was not necessary.  (Tr. 728.)

On May 4, 2016, Ms. Stehouwer filled out a "Medical Source Statement: Patient's Physical Capacity" form prepared by Trollinger's attorney.  (Tr. 607-608.)  She found Trollinger had the following limitations:

- He can occasionally lift less than 40 pounds and frequently lift less than 20 pounds;

- He can perform "minimal" standing and walking in an 8-hour work day;

- His ability to sit is impacted by his impairments;

- He can rarely climb, balance, stoop, crouch, kneel, and crawl;

- He can occasionally reach, push, and pull;

- He can frequently perform fine and gross manipulation;

- He is restricted from working near temperature extremes and pulmonary irritants;

10

- He has been prescribed a cane and brace;

- He requires the ability to alternate between sitting, standing, and walking at will;

- He experiences moderate to severe pain, which interferes with concentration, takes him off task, and causes absenteeism;

- He does not need to elevate his legs; and

- He requires additional unscheduled rest breaks during an 8-hour workday.

(*Id.*)

Trollinger visited Dr. Schaefer on May 5, 2016, reporting that while his lateral knee pain had resolved after his IT band injection, he was now having anterior knee pain and swelling.  (Tr. 733.)  On examination, Trollinger had a left knee effusion but his IT band was not tender.  (Tr. 734.)  Dr. Schaefer concluded Trollinger's pain was related to his osteoarthritis.  (*Id.*)  Dr. Schaefer offered Trollinger another injection, but Trollinger indicated he wanted to attempt therapy first.  (*Id.*)

On May 9, 2016, Trollinger attended physical therapy and reported knee pain.  (Tr. 738.) He was ambulating in a forward bent position and had "major loss" in his trunk range of motion. (*Id.*)  He missed his May 19, 2016 physical therapy appointment.  (Tr. 741.)

Trollinger visited Ms. Stehouwer on October 4, 2016, reporting bilateral thumb pain and left knee pain.  (Tr. 628.)  On examination, Trollinger had pain and tenderness in his hands, but normal strength and range of motion.  (Tr. 629.)  Ms. Stehouwer prescribed Ibuprofen 800 milligrams and ordered an x-ray.  (Tr. 631.)  Bilateral wrist x-rays revealed advanced osteoarthritis involving the first carpometacarpal joints.  (Tr. 745.)

Trollinger followed up with Ms. Stehouwer on October 12, 2016 to review his x-rays.

11

(Tr. 626.)  He indicated continued pain, with partial relief from ibuprofen.  (*Id.*)  Ms. Stehouwer

referred Trollinger to an orthopedist for a consultation.  (*Id.*)  Trollinger subsequently saw plastic

surgeon Bahar Bassiri Gharb, M.D., and received a Kenalog injection into his right thumb.  (Tr.

747.)

On October 13, 2016, Ms. Stehouwer submitted a letter regarding Trollinger.  In this

letter, Ms. Stehouwer reported Trollinger suffered from the following medical conditions: (1)

osteoarthritis of the carpometacarpal joints of both thumbs, which limited the use of the bilateral

hands; (2) primary osteoarthritis of the left knee; (3) osteoarthritis of the spine with

radiculopathy, lumbar region; (4) degenerative disc disease, lumbar spine; (4) cervical

radiculopathy, left side; (5) medial epicondylitis of the elbow; (6) premature ventricular

contractions; (7) GERD; (8) non-obstructive coronary artery disease; (9) adjustment disorder

with anxiety; (10) chronic hepatitis C; (12) left knee pain; and (13) situational depression.  (Tr.

620, 621.)  Ms. Stehouwer concluded "the above problems significantly limited Mr. Trollinger's

ability to be gainfully employed."  (Tr. 621.)

**C.**     **State Agency Reports**

      **1.**        **Mental Impairments**

On August 4, 2014,[3] Trollinger underwent a psychological consultative examination with

consultative examiner David V. House, Ph.D.  (Tr. 762-769.)  He described several physical

issues, along with a history of incarceration and substance abuse.  (Tr. 764.)  He reported some

counseling while in prison, but no medications.  (*Id.*)  During the evaluation, he had marked body

---

[3]     This examination was conducted in connection with a prior application for
disability.  However, as both parties have cited to it, the Court will include it in its
recitation of the evidence.

odor, was ambulating without overt difficulty, and was subdued with a blunted affect.  (Tr. 765.)

He described poor sleep, anxiety, depression, crying spells, and thoughts of suicide.  (Tr. 765-766.)

Based upon this evaluation, Dr. House diagnosed major depressive disorder, PTSD, cocaine use disorder, alcohol use disorder, and personality disorder.  (Tr. 768.)  Dr. House offered the following opinions on Trollinger's limitations:

> **Describe the claimant's abilities and limitations in understanding, remembering and carrying out instructions:**  Mr. Trollinger's long-term memory function is not well developed.  Short-term memory in some parlance does not inspire confidence.  The examiner would believe that likely he would have at least some difficulty following directions and that his short-term capabilities would be inconsistent.
>
> **Describe the claimant's abilities and limitations in maintaining attention and concentration and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks:**  Mr. Trollinger does demonstrate some difficulties with his concentration and attention.  Likely he can follow multi-step directions on a short-term basis, again to some degree, but more likely inconsistently.
>
> **Describe the claimant's abilities and limitations in responding appropriately to supervision and coworkers in a work setting:**  Mr. Trollinger presents as a rather imposing individual.  He does not really have a history of positive social interactions over time.  He spends time currently performing odd job types of tasks for people that he knows, to whom he refers to as family.  He really has no idea who his family is.  He did not present as directly hostile or obstructionistic with the examiner.  It would seem that on a limited basis he can get [a]long with others, as long as they don't threaten him in some way.
>
> **Describe the claimant's abilities and limitations in responding appropriately to work pressures and work settings:**  Mr. Trollinger's emotional resources and coping skills are quite low.  The examiner would see him as being highly restricted in the expression of his emotions.  The examiner would see him as highly dysfunctional and disruptive in a more formalized work environment.

(Tr. 768-769.)

13

On July 8, 2015, Trollinger underwent a psychological consultative examination with consultative examiner Michael Faust, Ph.D.  (Tr. 560-568)  Trollinger reported difficulty interacting with others and adjusting to life outside of prison.  (Tr. 561.)  He indicated trouble with sleep, concentration, and feelings of hopelessness.  (Tr. 562.)  Trollinger also described a lengthy criminal history, including 27 years of incarceration.  (Tr. 563.)  During the evaluation, he walked without an assistive device, exhibited good attention, and remained focused.  (*Id*.)  He had no difficulty understanding any of the questions asked of him.  (Tr. 565.)

Based upon this evaluation, Dr. Faust diagnosed unspecified depressive disorder, cocaine use disorder, alcohol use disorder, and unspecified personality disorder with antisocial traits. (Tr. 566.)  Dr. Faust offered the following opinions on Trollinger's limitations:

> **The claimant's mental abilities and limitations in understanding, remembering, and carrying out instructions.**  Mr. Trollinger did not exhibit any limitations understanding, remembering, or carrying out simple or complex instructions.  His overall cognitive or intellectual functioning is viewed to be in the average range.  He said he does not have problems with reading and showed no difficulty completing the general information form here today.  Thus, I do not see limitations in his ability to understand, follow, or remember written instructions.  With regard to verbally presented instructions, Marvin is also not viewed to have any difficulty understanding, remembering or carrying out instructions for task completion instructions, based on his performance in this evaluation.
>
> **The claimant's mental abilities and limitations in maintaining attention and concentration, persistence and pace to perform tasks and to perform multi-step tasks.**  Marvin was able to complete 7 digits forward and 4 digits backward.  He recalled 3 of 3 items after a delay.  He did not present with any difficulties with attention or memory.  Mr. Trollinger remained persistent for mental status tasks and exhibited normal work pace. In sum and based on this interview, Marvin is not viewed to have any limitations with regard to attention, concentration, persistence, or work pace.
>
> **The claimant's mental abilities and limitations in responding appropriately to supervision and coworkers in a work setting.**  Marvin

14

presented as somewhat depressed during the interview, but he answered all
questions.  Marvin exhibited some difficulty interacting due to an irritable
and blunted affect and depressed mood.  He reported a long history of
having difficulty getting along with coworkers and bosses in his
employment history as well as frequent fighting in childhood.  Mr.
Trollinger is currently viewed to have some mild limitations with regard to
responding appropriately to supervision or to coworkers in an employment
setting due to symptoms of a depressive disorder and personality disorder.

**The claimant's mental abilities and limitations in responding
appropriately to work pressures in a work setting.**  Marvin presented as
somewhat depressed, but he was not anxious or psychotic and said he does
not experience such symptoms.  In sum, from a psychological perspective,
Mr. Trollinger is viewed to have some limitations in his ability to respond
appropriately to work pressures in an employment setting due to symptoms
associated with depressive disorder.

(Tr. 566-568.)

On January 19, 2015, state agency physician David Dietz, Ph.D., reviewed Trollinger's

records and completed a Psychiatric Review Technique ("PRT").  (Tr. 111-112.)  Dr. Dietz found

Trollinger had moderate restrictions in activities of daily living; moderate difficulties in

maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or

pace; and no episodes of decompensation.  (*Id.*)

Dr. Dietz also completed a Mental Residual Functional Capacity ("RFC") Assessment.

(Tr. 116-118.)  Within this Assessment, Dr. Dietz found Trollinger was not significantly limited

in his abilities to (1) remember locations and work-like procedures; (2) understand and remember

very short and simple instructions; (3) carry out very short and simple instructions; (4) perform

activities within a schedule, maintain regular attendance, and be punctual within customary

tolerances; (5) sustain an ordinary routine without special supervision; (6) make simple work-

related decisions; (8) ask simple questions or request assistance; (9) be aware of normal hazards

and take appropriate precautions; (10) travel in unfamiliar places or use public transportation;

15

and (11) set realistic goals or make plans independently of others.  (*Id*.)  He  found Trollinger was moderately limited in his abilities to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) work in coordination with or in proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism from supervisors; (7) get along with co-workers or peers without distracting them or exhibiting behavioral extremes; (8) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and (9) respond appropriately to changes in the work setting.  (*Id*.)  Dr. Dietz explained the basis of his decision as follows:

> During periods of increased anxiety/depression, claimant would have mild difficulty with his memory.  At psych exam, he recalled 3/3 items immediately.  1/3 after a delay.  He would have moderate difficulty with remembering detailed instructions.
>
> ***
>
> At exam, claimant had difficulty organizing his thoughts.  His pace was a bit slow but his persistence was fair.  He refused to complete serial 7s, and at the physical exam, he refused to complete lumbar ROM testing.  He would likely have moderate difficulty with carrying out detailed instructions and maintaining his concentration for extended periods.
>
> ***
>
> Poor hygiene noted at psych [consultative examination], but not at physical [consultative examination], so it seems that claimant's hygiene may be related to his tenuous housing situation or his history of substance abuse.
>
> Claimant should not work in a customer service representative role.  He would have difficulty resolving conflicts with other coworkers, the public, and supervisors.  He could handle infrequent, superficial interactions with others.

16

\*\*\*

> Claimant has poor coping skills. He would adapt to changes if necessary, but changes should be infrequent.

(*Id.*)

On August 20, 2015, state agency physician Bonnie Katz, Ph.D., reviewed Trollinger's medical records and completed a PRT. (Tr. 131-132.) Dr. Katz found Trollinger had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (*Id.*)

Dr. Katz also completed a Mental ("RFC") Assessment. (Tr. 136-138.) Within this Assessment, Dr. Katz found Trollinger had no understanding and memory limitations or sustained concentration and persistence limitations. (*Id.*) She found Trollinger was moderately limited in his abilities to (1) interact appropriately with the general public; (2) accept instructions and respond appropriately to criticism from supervisors; (3) get along with co-workers or peers without distracting them or exhibiting behavioral extremes; (4) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and (5) respond appropriately to changes in the work setting. (*Id.*) Dr. Katz explained the basis of her decision as follows:

> During periods of increased anxiety/depression, claimant would have mild difficulty with his memory. At psych exam, he recalled 3/3 items immediately. 1/3 after a delay. He would have moderate difficulty with remembering detailed instructions.

> Most recent psych exam he did not exhibit difficulty [understanding, remembering, and following] instructions. He was able to carry out both simple and complex instructions.

> \*\*\*

17

At exam, claimant had difficulty organizing his thoughts.  His pace was a bit slow but his persistence was fair.  He refused to complete serial 7s, and at the physical exam, he refused to complete lumbar ROM testing.  He would likely have moderate difficulty with carrying out detailed instructions and maintaining his concentration for extended periods.

At most recent exam - was able to complete 7 digits forward and 4 digits backward.  He recalled 3 of 3 items after a delay.  He did not present with any difficulties with attention or memory.

***

Poor hygiene noted at psych [consultative examination], but not at physical [consultative examination], so it seems that claimant's hygiene may be related to his tenuous housing situation or his history of substance abuse.

Claimant should not work in a customer service representative role.  He would have difficulty resolving conflicts with other coworkers, the public, and supervisors.  He could handle infrequent, superficial interactions with others.

7/2015 Psych [consultative examination] - presented a good appearance and was dressed in clean, appropriate clothing, presented as clean shaven.  He exhibited some difficulty interacting due to an irritable and blunted affect and depressed mood.  He reported a long history of having difficulty getting along with coworkers and bosses in his employment history as well as frequent fighting in childhood.

***

Claimant has poor coping skills.  He would adapt to changes if necessary, but changes should be infrequent.

(*Id.*)

## 2. Physical Impairments

On July 24, 2014,[4] Trollinger underwent a physical consultative examination with

---

[4]  This examination was conducted in connection with a prior application for disability.  However, as both parties have referenced it in their briefs, the Court will include it in its recitation of the evidence.

18

Dorothy A. Bradford, M.D.  (Tr. 758-760.)  Trollinger reported left knee and lower back pain. (Tr. 758.)  On examination, Trollinger had an antalgic gait favoring the right leg and was ambulating with a cane.  (Tr. 759-760.)  He was unwilling to perform the range of motion portion of the examination, citing pain.  (Tr. 760.)  He had full strength in his upper and lower extremities.  (*Id*.)  His sensation was normal and he had negative straight leg raises.  (*Id*.)  An x-ray of his left knee indicated a moderate narrowing of the medial joint compartment due to degenerative joint disease.  (Tr. 752.)  Based upon this examination, Dr. Bradford opined Trollinger "should be restricted to sedentary activity."  (Tr. 760.)

On January 8, 2015, state agency physician Gerald Klyop, M.D., reviewed Trollinger's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 113-115.)  Dr. Klyop concluded Trollinger could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday.  (Tr. 114.)  He opined Trollinger could occasionally use right lower extremity foot controls and frequently use left lower extremity foot controls.  (*Id*.) He further found Trollinger could frequently climb ramps and stairs, never climb ladders, ropes, or scaffolds, frequently balance and crouch, and occasionally kneel and crawl.  (*Id*.)  Dr. Klyop concluded Trollinger should avoid concentrated exposure to unprotected heights, dangerous machinery, commercial driving, extreme heat and cold, wetness, humidity, and vibration.  (Tr. 115.)

On August 12, 2015, state agency physician Bradley J. Lewis, M.D., reviewed Trollinger's medical records and completed a Physical RFC Assessment.  (Tr. 134-136.)  He generally adopted Dr. Klyop's assessments, beyond finding Trollinger could occasionally use left

19

lower extremity foot controls, occasionally climb ladders, ropes, and scaffolds, frequently stoop,

and occasionally crouch. (*Id.*) He did not find any environmental limitations. (Tr. 135.)

**D.    Hearing Testimony**

During the December 2, 2016 hearing, Trollinger testified to the following:

- He lives with his girlfriend and three pets. (Tr. 59.) He has his GED and attended college for one year. (Tr. 60.) He occasionally drives. (Tr. 62.) He prepares simple meals. (Tr. 78.) His girlfriend performs the bulk of the household chores, though he does assist her at times. (*Id.*)

- He last worked in 2012 for a moving company. (Tr. 64.) He stopped working because the company closed. (Tr. 65.) He also previously worked for a vending machine company where he stocked vending machines. (Tr. 66.)

- He cannot work full-time because of back, knee, and thumb pain. (Tr. 69-70.) He cannot lift heavy objects or sit and stand for extended periods. (*Id.*)

- His thumbs ache constantly and he just began to receive treatment for this issue. (Tr. 71.) He has received cortisone shots and wears braces on his hands at all times. (Tr. 71-72.)

- He has received three injections in his left knee. (Tr. 72.) His doctors have indicated he will require a knee replacement if his knee condition worsens. (Tr. 73.) His doctors have also recommended back surgery, but his health insurance will not cover it. (*Id.*)

- He uses a cane to ambulate at all times. (Tr. 86.) He holds it in his right hand, in order to take weight off his leg left. (*Id.*) It was prescribed to him by his doctor, Christine Stehouwer, three years ago. (Tr. 87.) He elevates his left leg while sitting at home. (Tr. 88.)

- He has a cardiac condition and has an upcoming consultation regarding a possible pacemaker. (Tr. 74.) His heart condition impacts his breathing, especially when walking or in humidity. (Tr. 75, 86.)

- He is depressed and has been taking antidepressants for three years. (Tr. 76.) He visits a mental health clinic every two months. (Tr. 77.) He was in prison from 1976-2008, and being out of prison is "really hard on me so I get depressed a lot." (Tr. 79-80.) His medication is helpful. (Tr. 80.) He does not have any difficulty getting along with others. (Tr. 81.)

The VE testified Trollinger had past work as a coin collector (D.O.T. #292.483-010) and moving van driver helper (D.O.T. #904.687-010).  (Tr. 94.)  The ALJ then posed the following hypothetical question:

> And also assume that this individual can perform a full range of light[5] work, occasionally have use of the left foot controls, frequently climb ramps and stairs, occasionally climb ladders, ropes, and scaffolds, frequently stoop, occasionally kneel, crouch, and crawl.

(Tr. 95.)

The VE testified the hypothetical individual would not be able to perform Trollinger's past work as a coin collector and moving van driver helper.  (*Id*.)  The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as cafeteria attendant (light, unskilled, SVP 2); cleaner, housekeeper (light, unskilled, SVP 2); and mail clerk (light, unskilled, SVP 2).  (Tr. 95-96.)

The ALJ then asked the VE to consider the same hypothetical individual with the additional limitation the individual would be limited to frequent handling and fingering bilaterally.  (Tr. 96.)  The VE testified the hypothetical individual would be able to perform the previously identified jobs.  (*Id*.)

---

[5]     "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

21

Trollinger's attorney then questioned the VE, in pertinent part, as follows:

Q:      If we take the first hypothetical again, just as the Judge gave it to
        you, and I were to add to that any ambulation is going to require the
        medically necessary use of a single-point cane, is that going to
        change your answer about those particular jobs?

A:      Yes, it would.

Q:      In what way?

A:      All of those jobs are eliminated.  The use of a cane – basically, these
        are jobs that require walking, lifting, using your hands.

Q:      If were it light –

A:      If were it light.

Q:      – with those additional restrictions in the Judge's hypothetical and
        with the cane, if I were to ask you to go through the DOT and
        identify other jobs at the light level that would meet the requirements
        of that hypothetical, would you be able to do it?

A:      Maybe if I had a really long time to search but in general, no.

Q:      Okay.  Yeah.  Fair to say that that really significantly erodes the light
        job basically?

A:      It does.  It – it – pretty much the use of a cane for ambulation moves
        it to sedentary.

(Tr. 98-99.)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v.
Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a
claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and
416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of

22

a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since November 10, 2014, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: dysfunction of major joints, spine disorders, osteoarthritis of the carpomentacarpal joints of both thumbs, and coronary artery disease (20 CFR 416.920(c)).

23

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except the claimant can occasionally operate left foot controls. He can frequently climb ramps and stairs, occasionally climb ladders, ropes, or scaffolds, frequently stoop, and occasionally kneel, crouch, and crawl.  The claimant is limited to frequent bilateral handling and fingering.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on May **, 1964 and was 50 years old, which is defined as a younger individual age 18-49, on the date the application was filed.    The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since November 10, 2014, the date the application was filed (20 CFR 416.920(g)).

(Tr. 25-41.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the

Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at

24

* 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.  First Assignment of Error: RFC/Cane

In his first assignment of error, Trollinger argues the ALJ erred in failing to account for a cane in the RFC.  (Doc. No. 11 at 15.)  He asserts the ALJ "erroneously rejected [his] use of a cane, despite evidence of a consistently abnormal gait with use of a cane." (*Id.*)  Trollinger maintains the ALJ's analysis was "insufficient and does not provide an acceptable basis for

rejecting [his] use of an ambulatory device." (*Id.*)  Trollinger reasons this is not harmless error, as the VE "confirmed that use of a cane would restrict [him] to sedentary activity" which would "result in a finding of disability . . . under the medical vocational guidelines." (*Id.* at 17.)

The Commissioner argues the ALJ properly considered Trollinger's allegations and provided "sound reasons for rejecting" them.  (Doc. No. 12 at 13.)  The Commissioner maintains "although Plaintiff argues that his medical record sometimes reference him using a cane . . . substantial record evidence supports the ALJ's conclusion that Plaintiff did not require a cane to walk." (*Id.* at 14.)  She concludes the ALJ did not ignore or fail to include restrictions in the RFC, but "concluded that Plaintiff's impairments were not as debilitating as he alleged." (*Id.* at 19.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

Further, in rendering the RFC decision, the ALJ must "give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue,* 774 F. Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.,* 383 Fed

27

App'x 140, 148 (3rd Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, at step two, the ALJ determined Trollinger suffered from the severe impairments of dysfunction of major joints, spine disorders, osteoarthritis of the carpometacarpal joints of both thumbs, and coronary artery disease.  (Tr. 25.)  After determining Trollinger's impairments did not meet or equal a Listing, the ALJ went on to step four to consider the medical evidence regarding Trollinger's impairments.  (Tr. 28-40.)  In particular, the ALJ discussed Trollinger's testimony he required a cane for ambulation, as well as the numerous instances throughout the record he was noted to be ambulating with a cane.  (Tr. 29-36.)  The ALJ also noted two occasions in which Trollinger was ambulating without a cane.  (Tr. 30, 31.)  The ALJ provided the following discussion regarding Trollinger's cane usage:

> In addition, despite the evidence of an consistently abnormal gait with use of a cane, the cane was not prescribed (*Id.*), and notably, the claimant has been observed on occasion ambulating normally without said device (*see* Exhibit 23F/5; 11F/5).  Therefore, additional restrictions involving use of an assistive device is not warranted.

(Tr. 37.)

28

The ALJ determined Trollinger had the following residual functional capacity:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except the claimant can occasionally operate left foot controls. He can frequently climb ramps and stairs, occasionally climb ladders, ropes, or scaffolds, frequently stoop, and occasionally kneel, crouch, and crawl.  The claimant is limited to frequent bilateral fingering and handling.

(Tr. 28.)

The Court finds the ALJ's failure to include any limitation to account for Trollinger's need for a cane is not supported by the substantial weight of the evidence.  A review of the record indicates Trollinger's use of a cane is well-documented.  During his December 2014 and January 2015 physical therapy sessions, his physical therapist noted a cane at each visit.  (Tr. 374, 378, 381, 384, 390, 393, 397, 412, 416, 419.)  In February 2015, his physical therapist again noted he was ambulating with a standard cane and had a "significant decline in lower extremity strength." (Tr. 425, 426.)  His physical therapist continued to observe Trollinger's use of a cane in June 2015,  August 2015, and September 2015.  (Tr. 481, 571, 586.)

Trollinger's need for a cane is well documented across multiple treatment providers as well.  He was ambulating with a cane during a October 2015 office visit with Dr. Higuera Rueda. (Tr. 591.)  In January and March 2016, Dr. Reddy noted Trollinger had an antalgic gait and was using a cane for ambulation.  (Tr. 640, 682.)  In February 2016, Dr. Vrooman observed an antalgic gait with a cane.  (Tr. 653.)  During a March 2016 cardiology appointment, Trollinger was ambulating with a cane.  (Tr. 702.)  His physical therapists continued to observe ambulation with a cane in April and May 2016, and specifically noted he had a "shortened stride with stride with antalgic appearance" and ambulated in a "forward bent position."  (Tr. 719, 722, 738.) Finally, in her May 2016 medical source statement, Ms. Stehouwer reported Trollinger's cane

29

was prescribed. (Tr. 608.)

In light of the overwhelming documentation that Trollinger consistently ambulated with a cane, the prescribed status of this cane, and the repeated objective findings of an antalgic gait, the Court finds the RFC articulated by the ALJ, in its failure to accommodate the need for a cane, is not supported by substantial evidence. This failure to reflect Trollinger's use of a cane in the RFC, in the face of all this objective evidence, is particularly unreasonable in light of the VE's testimony this additional limitation would essentially eliminate all jobs at the light level of exertion. (Tr.99)

In the decision, the ALJ notes two occasions in the medical record where Trollinger was ambulating without an assistive device. Both examples were at psychiatric consultative examinations in August 2014 and January 2015. (Tr. 30, 31.) The Commissioner also references a May 2015 emergency room visit where Trollinger was ambulating without a cane. (Doc. No. 12 at 14, Tr. 468, 547.) However, contrasting these three instances with the 19 physical therapy visits at which Trollinger ambulated with a cane, the observations of multiple medical providers at seven different office visits of antalgic gait and use of a cane, and the prescribed status of the cane, it is clear substantial evidence does not support the ALJ's conclusion. Moreover, the ALJ incorrectly noted Trollinger's cane was not prescribed when reaching her conclusion Trollinger did not require a cane for ambulation. (Tr. 37, 608.)

Thus, the Court finds remand is necessary, thereby affording the ALJ an opportunity to consider Trollinger's use of a cane when formulating the residual functional capacity.

**B.      Second Assignment of Error: Opinion Evidence**

In his second assignment of error, Trollinger asserts the ALJ erred in the consideration

of the opinions of a consultative examiner and his treating physicians' assistant.  (Doc. No. 11 at 18.)  As these are two separate arguments with different sets of controlling law, the Court will consider each in turn below.

### a.  Physicians' Assistant Stehouwer

Trollinger argues the ALJ did not properly evaluate the opinion of Ms. Stehouwer, his treating physicians' assistant.  (Doc. No. 11 at 20.)  He insists the "ALJ valued the opinion of a non-examining physician over a physician assistant who had a lengthy treatment history" with him.  (*Id*.)  Trollinger contends the ALJ "did not place any value on the length of treatment as the basis for this physicians' assistant opinion."  (*Id*. at 21.)  Trollinger further asserts the ALJ's finding Ms. Stehouwer's opinion was inconsistent with her own treatment notes and the other medical evidence is "factually incorrect."  (*Id*. at 22.)

The Commissioner maintains the ALJ properly discounted Ms. Stehouwer's opinion.  (Doc. No. 12 at 22.)  The Commissioner asserts it "was within the ALJ's discretion to give less weight to a healthcare provider that is not a doctor" and "substantial evidence supported the ALJ's decision to discount" Ms. Stehouwer's opinion.  (*Id.*)

Under Social Security Regulations, a physicians' assistant is not an "acceptable medical source" entitled to the type of "controlling weight" an "acceptable medical source" enjoys.  *See* 20 C.F.R §§ 416.902(a)(1) - (8), 416.927(a)(1), 416.927(f).  However, the regulations also provide these opinions still must be considered, using the same factors listed in 20 C.F.R. §416.927(c).  The regulations further provide "not every factor for weighing opinion evidence will apply in every case" and the "adjudicator generally should explain the weight given to opinions from these source or otherwise ensure that the discussion of the evidence in the

determination or decision allows a claimant or subsequent reviewer to follow the adjudicators's reasoning."  20 C.F.R. §416.927(f)(1)-(2).

Social Security Ruling 06-03[6] further explains how opinion evidence from "other sources" should be treated.   SSR 06-03p provides information from "other sources" (such as a chiropractor) is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03p, 2006 WL 2329939 at *2-3 (August 9, 2006).  Interpreting this SSR, the Sixth Circuit has found opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion."  *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06-03p, the ALJ should have discussed the factors relating to his treatment of Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion").  *See also Williams v. Colvin,* 2017 WL 1074389 at *3 (N.D. Ohio March 22, 2017).

As discussed above, Trollinger's treating physicians' assistant, Christina Stehouwer, P.A., filled out a "Medical Source Statement: Patient's Physical Capacity" form in May 2016 and found Trollinger had the following limitations:

- He can occasionally lift less than 40 pounds and frequently lift less than 20 pounds;

- He can perform "minimal" standing and walking in an 8-hour work day;

---

[6]     The Court notes SSR 06-03p was rescinded on March 27, 2017.  This rescission is effective for claims filed on or after March 27, 2017.  SSR 96-2p, 2017 WL 3928298 at *1.

- His ability to sit is impacted by his impairments;

- He can rarely climb, balance, stoop, crouch, kneel, and crawl;

- He can occasionally reach, push, and pull;

- He can frequently perform fine and gross manipulation;

- He is restricted from working near temperature extremes and pulmonary irritants;

- He has been prescribed a cane and brace;

- He requires the ability to alternate between sitting, standing, and walking at will;

- He experiences moderate to severe pain, which interferes with concentration, takes him off task, and causes absenteeism;

- He does not need to elevate his legs; and

- He requires additional unscheduled rest breaks during an 8-hour workday.

(Tr. 607-608.)

In the decision, the ALJ discussed Ms. Stehouwer's opinions as follows:

On May 4, 2016, primary care provider Christina Stehouwer, PA, opined that the claimant can lift and carry less than 40 pounds occasionally and less than 20 pounds frequently, stand and walk minimal hours, rarely climb, balance, stoop, crouch, kneel, or crawl, frequently perform fine and gross manipulation, and occasionally reach and push/pull (Exhibit 14F).  Ms. Stehouwer indicated limited exposure to temperature extremes and pulmonary irritants, and opined that the claimant needs to be able to alternate positions between sitting, standing, and walking at will (*Id.*).  Ms. Stehouwer noted moderate to severe pain that interferes with concentration, takes him off task, and causes absenteeism, and she opined that the claimant requires additional unscheduled rest periods during an 8-hour workday

outside normal breaks (*Id.*).  In a letter dated October 13, 2016,[7] Ms. Stehouwer noted various medical conditions, all of which significantly limit the claimant's ability to be gainfully employed (Exhibit 17F).  Although Ms. Stehouwer has an extensive treating relationship with the claimant, her opinions do not warrant controlling or even great weight.  First, it is noteworthy that Ms. Stehouwer is not an acceptable medical source as defined by the Social Security Administration regulations.  Second, Ms. Stehouwer's rather limited opinions are inconsistent with her own treatment notes, which indicate generally unremarkable physical examination findings (Exhibit 3F, 5F, 8F, 16F, 18F) and tolerable pain levels with a relatively conservative regimen (Exhibit 16F/4).  Furthermore, the opinions are inconsistent with the remaining evidence of record, which confirms degenerative disc disease and osteoarthritis related tenderness, weakness, decreased range of motion, and gait abnormalities, in additional to minimal coronary artery disease, but consistently intact sensation and stability, and normal coordination (Exhibit 3F, 4F, 5F, 6F, 7F, 8F, 9F, 10F, 12F, 13F, 16F, 18F, 19F, 20F, 21F, 22F).  As a result, I give Ms. Stehouwer's opinions little weight.

(Tr. 39-40.)

The Court finds the ALJ properly evaluated Ms. Stehouwer's opinion.  The ALJ expressly acknowledged the opinion of Ms. Stehouwer, and provided several reasons for discounting her conclusions regarding Trollinger's physical functional capacity.  Specifically, the ALJ explained Ms. Stehouwer was not an "acceptable medical source" under the regulations and the opinion was not supported by the evidence referenced in the decision.  (Tr. 39-40.)  The ALJ specifically noted Trollinger's intact sensation, stability, and coordination, as well as the conservative course of treatment.  (*Id.*)  Prior to weighing Ms. Stehouwer's opinion, the ALJ also discussed, in detail, the objective findings made by Ms. Stehouwer, as well as her selected course of treatment.  (Tr. 30-36.)

---

[7]     The Court notes Ms. Stehouwer provided this second opinion in October 2016.  However, Trollinger does not object to the ALJ's assessment of this opinion so the Court will not address it further.

34

Trollinger argues the "ALJ did not place any value on the length of treatment" when assessing Ms. Stehouwer's opinion.  (Doc. No. 11 at 21.)  However, the ALJ clearly was aware of the treatment relationship, as she referenced it in her discussion of the opinion.  (Tr. 39.)  The ALJ was not required to afford Ms. Stehouwer's conclusions greater weight simply because a treatment relationship existed.  Moreover, the treating relationship is just one of several factors an ALJ considers when evaluating an opinion from "other sources."  An ALJ also considers the consistency of the opinion with the medical evidence, as the ALJ did here.  *See Cruse*, 502 F.3d at 541.  *See also* 20 CFR § 416.927(c),(f).

Trollinger further asserts the ALJ's finding Ms. Stehouwer's opinion was inconsistent with her own treatment notes and the other medical evidence is "factually incorrect."  (Doc. No. 11 at 22.)  However, a review of Ms. Stehouwer's treatment notes indicating a relatively conservative treatment course consisting of anti-inflammatory medication and physical therapy.  (Tr. 337, 351, 486, 616.)  In December 2014, Ms. Stehouwer even describes the treatment for Trollinger's knee as "conservative."  (Tr. 337.)  In March 2016, Trollinger reported to Ms. Stehouwer his pain was "tolerable on current regimen."  (Tr. 614.)  While Trollinger references other evidence which may support Ms. Stehouwer's findings, the ALJ's explanation and discussion of the evidence was not "factually incorrect."

In sum, because Ms. Stehouwer is an "other source," the ALJ was not required to accord any particular weight to her opinion nor was she required to provide "good reasons" for rejecting it.  Rather, the ALJ was required only to evaluate Ms. Stehouwer's opinion using the applicable factors set forth in the regulations.  *See Cruse*, 502 F.3d at 541.  The Court finds the ALJ properly evaluated and discounted Ms. Stehouwer's opinion for the reasons set forth above.

35

### b.    Consultative Examiner Dr. Bradford

Trollinger argues the ALJ failed to properly consider the opinion of consultative examiner Dr. Bradford.  (Doc. No. 11 at 18.)  He asserts the ALJ "misstates the evidence and fails to apply appropriate standards for evaluating a consultative, medical opinion."  (*Id*. at 19.) Trollinger contends the ALJ failed to provide a meaningful evaluation of the opinion and "ignores the hierarchy and value of giving preference to the opinion of a physician who actually examined the claimant."  (*Id*. at 20.)

The Commissioner maintains the ALJ properly evaluated and weighed Dr. Bradford's opinion.  (Doc. No. 12 at 20.)  She asserts "the fact that Plaintiff does not agree with the ALJ's determination does not mean it is unsupported by the record."  (*Id*. at 21.)  The Commissioner notes Dr. Bradford's examination was conducted prior to Trollinger's application date, arguing Dr. Bradford did not have the benefit of considering the subsequent medical evidence documenting improvement.  (*Id*.)

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 C.F.R. § 404.1527(e)(2)(i).  Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions.  *Id*.  When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions."  20 C.F.R. §

36

404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight.  *Id.*

However, the Sixth Circuit has held the failure to assign weight to the opinion of a consultative, non-treating source may not constitute reversible error if the ALJ decision is otherwise supported by substantial evidence.  *See Dykes ex. rel. Brymer v. Barnhart,* 112 F. App'x 463, 468 (6th Cir. 2004) ("if the refusal to even acknowledge the opinion of a treating physician was harmless error in *Heston*, then the ALJ's failure in the present case to discuss thoroughly the opinion of a consultative examiner does not warrant reversal."); *Salter v. Comm'r of Soc. Sec.,* 2015 WL 1880393 at *8 (N.D. Ohio Apr. 24, 2015); *Peshe v. Comm'r of Soc. Sec.,* 2015 WL 6437216 at *12 (N.D. Ohio Oct. 22, 2015).  *See also Pasco v. Comm'r of Soc. Sec.,* 137 Fed. App'x 828, 839 (6th Cir. 2005) (finding an ALJ did not err in failing to discuss a consultative examiner report, when the claimant did not explain how the report would support her disability claim.)

As noted *supra,* Trollinger underwent a consultative examination with Dorothy A. Bradford, M.D., on July 24, 2014.  (Tr. 758-760.)  Based upon this examination, Dr. Bradford opined Trollinger "should be restricted to sedentary activity."  (Tr. 760.)

In the decision, the ALJ thoroughly recounted the medical evidence regarding Trollinger's physical impairments.  (Tr. 30-36.)  The ALJ discussed Dr. Bradford's examination as follows:

> On July 24, 2014, the claimant underwent a consultative examination with Dorothy Bradford, M.D., in conjunction with a prior disability application,

37

complaining of low back pain and left knee pain (Exhibit 22F).
Examination revealed an antalgic gait with use of a cane, decreased left
knee extension, absent left patellar reflexes, and the claimant was unwilling
to attempt lumbar range of motion (*Id*.).  However, examination revealed
normal station and posture, negative Romberg testing, otherwise normal
extremity range of motion, full strength, normal sensation, and negative
straight leg raising (*Id*.).  An x-ray of the left knee showed moderate
narrowing of the medial joint compartment due to degenerative joint
disease, with some spurring at the lateral tibial condyle (Exhibit 21F/2).
Dr. Bradford diagnosed the claimant with degenerative joint disease of the
left knee and lumbar spine, and opined that he should be restricted to
sedentary work (Exhibit 22F).

\*\*\*

As for the opinion evidence, I give little weight to the opinion rendered by
consultative examiner Dorothy Bradford, M.D., on July 24, 2014, that the
claimant should be restricted to work at the sedentary exertional level
(Exhibit 22F).  This opinion was rendered years ago, in conjunction with a
prior disability application, and therefore cannot be considered an accurate
assessment of the claimant's current physical functioning (*Id*.).  In addition,
the opinion is inconsistent with the evidence dated subsequent to the
rendering of the opinion, which indicates ongoing tenderness, decreased
range of motion, weakness, and impaired gait with use of an assistive
device, but consistently intact sensation, normal joint stability, and normal
coordination (Exhibit 3F, 4F, 5f, 6F, 7F, 8F, 9F, 10F, 12F, 13F, 16F, 18F,
19F, 20F, 21F, 22F).  A limitation to work at the sedentary exertional level
is also inconsistent with the relatively conservative scope of medical
treatment and the indications of intact activities of daily living (Exhibit 3F,
4F, 5F, 6F, 7F, 8F, 9F, 10F, 12F, 13F, 16F, 18F, 19F, 20F, 21F, 22F, 11F,
Hearing Testimony).  Therefore, I give the opinion little weight.

(Tr. 30, 38.)

The Court finds the ALJ properly evaluated Dr. Bradford's opinion.  The ALJ expressly

acknowledged Dr. Bradford's opinion, noting it was rendered in conjunction with a prior

application for disability.  (Tr. 38.)  The ALJ ascribed "little weight" to this opinion and provided

several reasons for doing so.  (*Id*.)  Specifically, the ALJ noted it was not consistent with the

medical evidence, the treatment course, and Trollinger's activities of daily living.  (*Id.*)

Indeed, prior to discussing Dr. Bradford's opinion, the ALJ thoroughly discussed and reviewed all of Trollinger's treatment notes, diagnostic testing, and activities of daily living.  (Tr. 30-37.)  In particular, the ALJ acknowledged the diagnostic testing established degenerative disc disease and severe left knee osteoarthritis, but the examinations had revealed "normal upper extremity range of motion, intact sensation, normal coordination . . . recent examination findings of full strength . . . generally normal respiration, and otherwise normal extremity range of motion."  (Tr. 36-37.)  The ALJ also noted Trollinger had indicated he was able to perform household chores, prepare simple meals, use public transportation, and attend to his own personal hygiene.  (Tr. 38.)  The ALJ discussed Trollinger's conservative treatment course, including non-narcotic medication, therapy, and occasional injections, without any need for inpatient treatment or surgical measures.  (*Id*.)  After this careful review, the ALJ provided several reasons for why she was affording Dr. Bradford's opinion "little weight."  (*Id*.)  Procedurally, the regulations require no more.  Thus, the Court finds the ALJ sufficiently articulated her reasons for according "little weight" to Dr. Bradford's opinion, and further, that those reasons are supported by substantial evidence.[8]

---

[8]     Trollinger also argues the ALJ "ignore[d] the hierarchy" when ascribing greater weight to the opinions of state agency physicians Drs. Klyop and Lewis, who found he could perform a reduced range of light work.  (Doc. No. 11 at 20.)  While an ALJ will generally afford greater weight to physicians who have examined a claimant, the regulations do not *require* the ALJ to assign more weight to the opinion of an examining source over a non-examining source.  *See* 20 CFR § 416.927(c)(1).  Moreover, the opinions of non-examining state agency physicians are "experts in the evaluation of the medical issues in disability claims."  *Smead v. Comm'r of Soc. Sec.,* 2016 WL 7362619 at *6 (N.D. Ohio July 15, 2016)(citing *Douglas v. Comm'r of Soc. Sec.,* 832 F.Supp 2d 813, 823-824 (S.D. Ohio 2011).).  Thus, the "opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization."  *Id*.

Accordingly, the Court finds the ALJ did not err in rejecting Dr. Bradford's opinion.

**C.     Third Assignment of Error: Sentence Six Remand**

In his third assignment of error, Trollinger contends this matter should be remanded for

further administrative proceedings pursuant to Sentence Six of 42 USC §405(g) because he

provided new and material evidence to the Appeals Council.  (Doc. No. 11 at 22, 23.)  He asserts

this evidence is "new" as it documents his left total knee arthroplasty, which occurred two

months after the ALJ hearing.  (*Id*. at 23.)  Trollinger contends this evidence is material, as it

reveals he required a wheeled walker after his operation and this "directly relates to the disputed

need for a walker or cane and would change the ALJ's RFC."  (*Id.*)  Trollinger argues he had

established "good cause" for failing to present this evidence to the ALJ, as "the timing of this

medical treatment and collection of this evidence was not within [his] control and therefore not

available at the time of the hearing."  (*Id*. at 24.)

The Commissioner argues a remand under Sentence Six is not warranted because this

evidence is not material.  (Doc. No. 12 at 23.)  The Commissioner notes the evidence

demonstrates Trollinger required a wheeled walker to recover from his knee surgery, but "it is

unclear to what extent the new evidence relates to deterioration subsequent to the relevant period

of a previously non-disabling condition."  (*Id*. at 24.)  The Commissioner asserts the new

evidence "does not demonstrate Plaintiff's knee condition would remain debilitating for a period

of at least 12 months."  (*Id*.)

The Sixth Circuit has repeatedly held "evidence submitted to the Appeals Council after

_____

Therefore, it was within the ALJ's discretion to assign greater weight to the state
agency physicians than Dr. Bradford, as she considered both under the same
factors contained in 20 CFR § 416.927.

40

the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  A district court can, however, remand the case for further administrative proceedings in light of such evidence, if a claimant shows the evidence satisfies the standard set forth in sentence six of 42 U.S.C. § 405(g).  *Id.  See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996); *Lee v. Comm'r of Soc. Sec.*, 529 Fed. Appx. 706, 717 (6th Cir. July 9, 2013) (stating that "we view newly submitted evidence only to determine whether it meets the requirements for sentence-six remand").  Sentence Six provides that:

> The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g) (emphasis added).

Interpreting this statute, the Sixth Circuit has held that "evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' " *Foster*, 279 F.3d at 357 (quoting *Sullivan*, 496 U.S. at 626).  Evidence is "material" only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'"  *Id*. (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir.1988)).  *See also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir.2007) (noting that evidence is "material" if it "would likely change the Commissioner's

41

decision."); *Courter v. Comm'r of Soc. Sec.*, 2012 WL 1592750 at * 11 (6th Cir. May 7, 2012) (same).  Evidence is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition after the administrative hearing.  *See Prater v. Comm'r of Soc. Sec.*,---- F. Supp.3d ----, 2017 WL 588496 at * 2 (N.D. Ohio Feb. 14, 2017).  *See also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir.2003); *Sizemore*, 865 F.2d at 712 ("Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition"); *Deloge v. Comm'r of Soc. Sec.*, 2013 WL 5613751 at * 3 (6th Cir. Oct.15, 2013) (same).

In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357.  *See also Willis v. Sec'y of Health & Hum. Servs.*, 727 F.2d 551, 554 (6th Cir. 1984).  "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement."  *Courter*, 2012 WL 1592750 at * 11. Rather, the Sixth Circuit "takes 'a harder line on the good cause test' with respect to timing, and thus requires that the clamant 'give a valid reason for his failure to obtain evidence prior to the hearing.'"  *Id.* (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986)).  This includes "detailing the obstacles that prevented the admission of the evidence." *Courter*, 2012 WL 1592750 at * 11.  *See also Bass*, 499 F.3d at 513.

The burden of showing that a remand is appropriate is on the claimant.  *See Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010).  When a district court grants remand pursuant to sentence six, it "neither affirm[s] nor reverse[s] the ALJ's decision, but simply remand [s] for further fact-finding."  *Courter*, 2012 WL 1592750 at * 11.

42

*See also Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).  Under these circumstances, the district court retains jurisdiction and enters final judgment only "after postremand agency proceedings have been completed and their results filed with the court." *Shalala v. Schaefer*, 509 U.S. 292, 297, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993).  *See also Melkonyan*, 501 U .S. at 98; *Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 841 (6th Cir. 2006).

The record reflects Trollinger submitted the following evidence to the Appeals Council. (Tr. 8-14.)  On May 4, 2017, Trollinger consented to a left total knee arthroscopy with Dr. Higuera Rueda.  (Tr. 11.)  In anticipation of this operation, Dr. Higuera Rueda prescribed a wheeled walker and ordered a cardiac assessment for surgical clearance.  (Tr. 10.)  Trollinger visited his plastic surgeon Dr. Bahar Bassiri Gharb on May 9, 2017 and scheduled a follow up for July 10, 2017.  (Tr. 8.)

Because the undersigned has recommended this matter be remanded under sentence four for further consideration of the evidence in fashioning the RFC, the Court need not determine whether the above evidence is sufficient to warrant a remand under sentence six.  However, it is recommended that, on remand, ALJ should consider whether the above records submitted by Trollinger to the Appeals Council, as well as any other pertinent records, relate back to the time period under consideration, in making her decision about whether Trollinger retains the capacity to perform the physical functions currently set forth in the RFC.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further consideration consistent with this decision.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: April 24, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**